UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AMY WAKEMAN,

    Plaintiff,                                          Hon. Janet T. Neff

v.                                                    Case No. 1:09-CV-1111

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/


## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 27 years of age at the time of the ALJ's decision. (Tr. 22, 24). She successfully completed high school and worked previously as a waitress. (Tr. 22).

Plaintiff applied for benefits on September 16, 2004, alleging that she had been disabled since July 31, 2004, due to mental illness, migraines, substance abuse, and asthma. (Tr. 80-82, 120, 711-13). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 25-79, 714-18). On May 18, 2007, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, James Lozer. (Tr. 721-54). In a written decision dated August 24, 2007, the ALJ determined that Plaintiff was not disabled. (Tr. 14-24). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 6-9). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On November 9, 2003, Plaintiff reported to the emergency room complaining of a migraine headache. (Tr. 136). Plaintiff reported that she was experiencing "the worst headache she has ever had." (Tr. 136). When asked if she had been drinking, Plaintiff indicated that she

consumed only "one shot of alcohol." (Tr. 136). When confronted further, Plaintiff acknowledged that she "had at least five shots of alcohol." (Tr. 136). The results of an examination, including a CT scan of Plaintiff's head, were unremarkable. (Tr. 136-38). Plaintiff was given morphine and Vicodin and later discharged in stable condition. (Tr. 137-39).

On April 13, 2004, Dr. Steven Kraker reported that Plaintiff's asthma "is doing very well now" that Plaintiff was complaint with her treatment instructions and taking her medication "exactly as she should be." (Tr. 424).

On June 8, 2004, Plaintiff reported to the emergency room complaining of "extreme" knee pain. (Tr. 212). Plaintiff entered the emergency room in a wheelchair and was "wailing in pain." (Tr. 212). An examination of Plaintiff's knee, including x-rays, revealed bruising and swelling but was otherwise unremarkable. (Tr. 212-14). Plaintiff was given pain medication (Dilaudid and Vicodin), after which she "was able to walk out of [the emergency room] with only a mild limp." (Tr. 212-14).

On July 1, 2004, Plaintiff reported to the emergency room complaining that she was experiencing a migraine headache. (Tr. 358-60). The results of an examination were unremarkable and Plaintiff was given narcotic pain medication and discharged. (Tr. 358-60).

On July 3, 2004, Plaintiff reported to the emergency complaining that she was experiencing a migraine headache. (Tr. 247-48). The results of an examination, including a CT scan of Plaintiff's head, were unremarkable. (Tr. 247-48, 252). Plaintiff was given morphine, after which she "removed her own IV and left the emergency department without receiving discharge instructions." (Tr. 246, 248). Plaintiff returned to the emergency room the following day, again complaining that she was experiencing a migraine headache. (Tr. 244). Plaintiff was instructed to

4

"follow up with her primary care physician to obtain adequate relief of her migraine headaches." (Tr. 245).

On July 20, 2004, Plaintiff reported to the emergency room complaining that she was experiencing a migraine headache. (Tr. 236-37). Plaintiff was given narcotic pain medication, after which she was discharged in "good" condition. (Tr. 236-37).

On September 3, 2004, Dr. Steven Van Doornik observed that Plaintiff "has not been treated with any prophylactic agents for her headaches." (Tr. 269-70). Accordingly, the doctor prescribed Klonopin and Relpax. (Tr. 269-70).

Between September 3, 2004, and September 5, 2004, Plaintiff reported to the emergency room on three occasions complaining that she was experiencing a migraine headache. (Tr. 342-47). On each occasion, Plaintiff was provided narcotic pain medication. (Tr. 342-47).

On September 9, 2004, Plaintiff reported to the emergency room complaining of a migraine headache. (Tr. 300-01). Plaintiff stated that "Dilaudid is what I usually get." (Tr. 301). Despite concerns that Plaintiff was engaged in "drug-seeking behavior," the doctor provided Plaintiff with Dilaudid after which she was discharged in stable condition. (Tr. 301).

On September 11, 2004, Plaintiff reported to the emergency room complaining of a migraine headache. (Tr. 295-96). The doctor reported that Plaintiff arrived accompanying a family member who reported to the emergency department for a separate matter. (Tr. 295). While with her family member, Plaintiff "seemed comfortable and in no distress, but eventually she developed [a] headache." (Tr. 295). The results of an examination were unremarkable and Plaintiff was given Thorazine, Benadryl, and Phenergan. (Tr. 296). Plaintiff complained that her headache was

"pounding" and requested Dilaudid. (Tr. 296). The doctor refused Plaintiff's request, noting that she "do[es] not treat migraines with narcotics." (Tr. 296).

On September 13, 2004, Plaintiff reported to the emergency room complaining of migraine headaches and requesting pain medication. (Tr. 274-76). The doctor reported that Plaintiff "appears to be lying quietly in her room but begins crying when a nurse or this examiner enter the room." (Tr. 276). Plaintiff was given morphine. (Tr. 276).

On September 17, 2004, Plaintiff reported to the emergency room complaining that she was experiencing a migraine headache. (Tr. 338-39). Plaintiff was provided narcotic pain medication. (Tr. 338-39).

On October 1, 2004, Plaintiff was admitted to the hospital after consuming "at least" seven shots of rum and 35-40 Tylenol pills. (Tr. 320-30). Plaintiff was diagnosed with bipolar disorder and discharged the following day. (Tr. 328-30).

On October 6, 2004, Plaintiff was examined by Dr. Isha Salva, with Community Mental Health of Ottawa County. (Tr. 475-77). Plaintiff reported experiencing episodes of mania and elevated mood followed by crying spells and depressed mood. (Tr. 475). She also reported experiencing panic attacks, migraine headaches, and asthma. (Tr. 475). Plaintiff acknowledged using alcohol, marijuana, ecstasy, and crack cocaine, but asserted that "she has not used anything in awhile." (Tr. 475). The results of a mental status exam were unremarkable. (Tr. 476). Plaintiff was diagnosed with: (1) bipolar disorder, (2) polysubstance dependence in early remission, (3) post-traumatic stress disorder, and (4) panic disorder with agoraphobia. (Tr. 476). Dr. Salva modified Plaintiff's medication regimen. (Tr. 477).

On November 18, 2004, Plaintiff reported that her medications had "helped" her migraines. (Tr. 105). On November 22, 2004, Plaintiff reported to Dr. Salva that she "has been doing much better than before." (Tr. 473). Plaintiff reported that "her mood is much better than before" and, moreover, that she "is not as impulsive" and not suicidal. (Tr. 473).

On December 22, 2004, Plaintiff reported to Dr. Salva that she was "not doing well" and had "various concerns" about her present medications. (Tr. 513). Plaintiff's medications were subsequently modified. (Tr. 508-11).

Between January 4, 2005, and January 25, 2005, Plaintiff reported to the emergency room on eight separate occasions complaining that she was experiencing a migraine headache. (Tr. 553-75). On each occasion, Plaintiff was provided narcotic pain medication. (Tr. 553-75).

On January 31, 2005, Plaintiff reported to Dr. Salva that "her mood has been much better." (Tr. 508). On February 22, 2005, Plaintiff reported that her new medications were "helping her" and that "she is doing much better." (Tr. 506).

On June 1, 2005, Dr. Salva met with Plaintiff and her mother. (Tr. 524). Plaintiff's mother reported that she was "tired of [Plaintiff's] drug seeking behavior and requesting for things that she may not need." (Tr. 524). Plaintiff's mother also reported that Plaintiff's mood was "stable" and "does not seem to be up and down anymore." (Tr. 524). Dr. Salva reported that "overall [Plaintiff] is doing better." (Tr. 524).

On July 1, 2005, Plaintiff reported to the emergency room complaining of a migraine headache. (Tr. 206-07). The results of an examination were unremarkable. (Tr. 206-07). Plaintiff was given morphine and discharged home. (Tr. 206-07). On July 26, 2005, Dr. Salva observed that Plaintiff "seems to be drug seeking." (Tr. 535).

7

On August 26, 2005, Plaintiff reported that her "moods have been stable" and that she was doing well. (Tr. 636). On October 2, 2005, Plaintiff reported to Dr. Salva that she was "doing much better." (Tr. 634). The doctor noted that "there is no recent narcotic use." (Tr. 634).

On October 30, 2005, Plaintiff was "out drinking," after which she expressed a desire to "use a kitchen knife to kill herself." (Tr. 502). Plaintiff was taken to the emergency room where she denied suicidal ideation, but complained that she was experiencing a migraine headache for which she requested pain medication. (Tr. 502). Plaintiff was given medication for her headache and discharged the following day. (Tr. 502, 632).

On April 7, 2006, Plaintiff reported to Dr. Salva that she "has not taken any Prozac for three weeks." (Tr. 630).

On April 14, 2006, Plaintiff was admitted to the hospital after experiencing "depression and thoughts of suicide." (Tr. 582-88). Plaintiff responded well to treatment and was discharged on April 24, 2006, at which point her condition was described as "stable." (Tr. 594-626). Plaintiff was diagnosed with (1) bi-polar disorder, (2) history consistent with post-traumatic stress disorder, (3) cannabis abuse, (4) alcohol abuse, and (5) nicotine dependence. (Tr. 597). Plaintiff was also instructed to "not smoke cigarettes as her medicines will not work as well." (Tr. 596).

On May 15, 2006, Plaintiff was examined by Dr. Salva. (Tr. 628-29). The results of a mental status examination were unremarkable and Plaintiff was "stable." (Tr. 628).

On May 19, 2006, Plaintiff began treating with Dr. L. Lamar Styer. (Tr. 682). On July 6, 2006, Plaintiff reported to Dr. Styer that she recently experienced a "pretty bad asthma attack." (Tr. 679). The doctor noted that Plaintiff has been smoking and not taking her asthma

8

medication. (Tr. 679). On July 20, 2006, Dr. Styer reported that Plaintiff's condition was such that "it seems reasonable for her to try to get a job." (Tr. 679).

On September 1, 2006, Dr. Styer reported that Plaintiff was working and "seeing improvement with her headaches." (Tr. 677). On September 26, 2006, Dr. Styer reported that Plaintiff's headaches were responding to trigger point injections. (Tr. 676). With respect to Plaintiff's asthma, the doctor reported that it was "stable," but that Plaintiff "needs to quit smoking." (Tr. 676).

On November 16, 2006, Plaintiff reported to Dr. Styer that her current medication was helping with her headaches. (Tr. 674). On November 22, 2006, Dr. Styer reported that Plaintiff continues to smoke. (Tr. 673). On January 10, 2007, Plaintiff reported to Dr. Styer that her current medication was helping with her headaches. (Tr. 671). On January 29, 2007, Dr. Styer reported that Plaintiff's headaches were "controlled relatively well" on medication and that Plaintiff "has a job and [is] functioning." (Tr. 670). The doctor also observed that Plaintiff continues to smoke. (Tr. 670). Treatment notes dated February 10, 2007, indicate that Plaintiff's headaches "aren't doing too bad." (Tr. 669). On March 22, 2007, Dr. Styer reported that Plaintiff was working on her new home spa business at home. (Tr. 668).

On May 16, 2007, Plaintiff completed a questionnaire regarding her activities. (Tr. 660-66). Plaintiff reported that on a typical day she watches television, washes laundry, prepares meals, and performs other "household stuff." (Tr. 661). Plaintiff reported that she also likes to read, play putt-putt golf, watch movies, walk her dog, perform crafts, and go swimming. (Tr. 661).

9

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from (1) bipolar disorder, (2) a history of drug and alcohol abuse, and (3) asthma with a history of poor compliance, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 16-18). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 18-24). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work at all exertional levels subject to the following limitations: (1) no concentrated exposure to extreme cold or humidity; and (2) only moderate exposure to fumes, odors, and dusts. (Tr. 18). The ALJ also concluded that Plaintiff experiences moderate limitation in her ability to maintain attention and concentration for extended periods and respond appropriately to changes in the work setting. (Tr. 18). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her

limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Lozer.

The vocational expert testified that there existed approximately 44,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 749-50). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).

        a.      The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts that because Dr. Styer was her treating physician, the ALJ was required to afford controlling weight to his opinion. Plaintiff has failed, however, to identify the opinion in question or articulate in any way the portion(s) thereof that were not appropriately analyzed by the ALJ. Instead, Plaintiff merely asserts in a wholly conclusory manner that the ALJ failed to accord sufficient weight to Dr. Styer's opinion. While the Court can surmise from the

ALJ's decision the opinion to which Plaintiff's argument is directed, such does not relieve Plaintiff of the affirmative obligation to more clearly articulate the basis for her claims of error. *See, e.g., Porzillo v. Department of Health and Human Services*, 369 Fed. Appx. 123, 132 (Fed. Cir., Mar. 12, 2010) (claimant "waves any arguments that are not developed"); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 537 n.25 (10th Cir. 2000) (arguments "superficially" developed are waived); *Financial Resources Network, Inc. v. Brown & Brown, Inc.*, 2010 WL 4806902 at *30 n.29 (D. Mass., Nov. 18, 2010) (same).

On June 6, 2007, Dr. Styer completed a questionnaire concerning Plaintiff's limitations. (Tr. 701-07). The doctor reported that Plaintiff suffers from chronic headaches and that her prognosis was "fair to poor as far as keeping her working enough hours to be hire-able to most employers." (Tr. 701). The doctor reported that Plaintiff experiences a "marked limitation" in her ability to deal with work stress. (Tr. 704). Dr. Styer reported that if Plaintiff were working, she would need to take a 20 minute rest break every 60-90 minutes. (Tr. 705). The doctor also reported that "we've come up with a regimen that limits her use of [the] emergency room, but unfortunately hasn't done away with the headaches completely." (Tr. 701).

The ALJ afforded only minimal weight to Dr. Styer's opinion. Specifically, the ALJ concluded:

> Normally, the opinions of a treating physician are given significant, if not controlling weight. However, in this case, the limitations set forth by Dr. Styer are not consistent with other medical observations and the claimant's activities of daily living. Dr. Styer has indicated that the claimant suffers from vomiting, malaise, confusion, visual disturbance, mood changes, and photosensitivity four to five days a week, but her symptoms from the migraines are controlled to the point of keeping her from going to the emergency room. Dr. Styer's assessment (RFC form) of her functioning fails to even address the claimant's substantial record of polysubstance abuse that her other

13

doctors are aware of. Most of her emergency room visits involved the voluntary use of intoxicants, either drugs or alcohol. Dr. Styer's assessment is therefore flawed and incomplete, because he seems unaware of the effect of substance abuse on [the claimant's] functioning during the period of treatment. Dr. Styer's treating assessment is not accorded full weight, because it obviously lacks a full and comprehensive view of the claimant's state of health.

The 2004 and 2005 emergency room visits for headaches documented that she had been using alcohol. The claimant testified that she no longer drinks alcohol. There is medical evidence that claimant has been told that her pets and cigarette smoke cause her symptoms but she continues to have pets and smoke cigarettes.[2] She testified at the hearing that she continues to have pets and smoke cigarettes.[3] She even sought employment in a pet shop.[4] The claimant's noncompliance has placed much doubt of the actual severity of her symptoms. Additionally, a progress note indicates that on March 22, 2007, the claimant had been working on her new business at home while having new onset of "incredible knee pain" without clarity of where it was coming from.[5] No radiology tests were ordered. Nevertheless, she indicated it was necessary to increase her use of Oxycontin. Dr. Styer, a family practitioner, indicated that the claimant's mental disorders increase her headaches. However, at the time of her discharge from Saint Mary's Health Care April 200[6], the claimant's treating psychologist indicated her prognosis was good providing she takes her medications as prescribed; keeps all of her appointments; and stays away from alcohol, nicotine, caffeine, and street drugs.[6] The claimant has diminished her credibility regarding the severity of her impairments, thus minimizing the weight that would otherwise be given to the limitations of her treating physician, Dr. Styer.

(Tr. 21-22).

---

[2] (Tr. 127-35, 146, 177, 529, 582, 590, 669-71, 675-76).

[3] (Tr. 731-32).

[4] (Tr. 725).

[5] (Tr. 668).

[6] (Tr. 589-98).

14

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378

15

F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to his assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

While the ALJ's analysis could perhaps have been better articulated, his rationale for minimizing Dr. Styer's opinion is well supported. As the ALJ recognized, Dr. Styer's opinion accepts the notion that Plaintiff repeatedly went to the emergency room to obtain treatment for her headaches. This is overwhelmingly contradicted by the medical record which reveals that Plaintiff used the emergency room as a way to obtain narcotics. As the ALJ concluded, the doctor's failure to recognize such is a valid basis for discounting his opinion.

As the ALJ further observed, Plaintiff's credibility must also be called into question as her subjective allegations are contradicted by the evidence of record. This is relevant because a review of Dr. Styer's opinion reveals that much of it based on Plaintiff's subjective reporting of her symptoms and limitations. (Tr. 701-07). Thus, to the extent that Dr. Styer's opinion is based upon Plaintiff's subjective allegations, the doctor's opinion is entitled to limited weight. As the ALJ also recognized, Dr. Styer's opinion is contradicted by the evidence of record, including the doctor's own contemporaneous treatment notes and Plaintiff's reported activities. In sum, substantial evidence exists to support the ALJ's decision to accord less than controlling weight to Dr. Styer's opinion.

b. The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 44,000 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon his response thereto.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: January 7, 2011                    /s/ Ellen S. Carmody
                                         ELLEN S. CARMODY
                                         United States Magistrate Judge